*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
September 19, 2024

*In re* DONAHUE, Minors.

No. 368204
Genesee Circuit Court
Family Division
LC No. 13-130593-NA

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Respondent-mother appeals as of right an order exercising jurisdiction over the minor children, GD and MD, under MCL 712A.2(b)(1) and (2). We affirm.

## I. FACTUAL BACKGROUND

This child-protection action arises out of a petition filed on March 24, 2023, by petitioner, the Department of Health and Human Services (DHHS). The petition alleged that on or around February 6, 2023, mother got into an argument with father[1] in front of the children. During the argument, father punched mother in the face and pushed her to the ground. GD stated that she picked up baby MD because she feared that he would be stepped on. The petition further summarized the incident as follows:

02/06/2023 9:29 [p.m.] – [GD] called dispatch stating she really needs help. Someone was heard crying in the background. [GD] reported her father is hurting her mother and physically assaults her. She reported father is outside. [Mother] spoke with dispatch as well and stated [father] is back inside and his mother and sister are enroute [sic] to assault her. [Mother] refused EMS. [Father] was intoxicated and there were no weapons reported. Another caller, Jeanie Woolridge, reported she was just at the home and the father . . . is highly intoxicated. She

---

[1] Father does not participate in this appeal.

reported [father] assaulted [GD] and smacked her in the head. [Father] was arrested and transported to Genesee County Jail.

Children's Protective Services (CPS) received a referral about the incident on February 9, 2023. GD told CPS investigator Samantha Brown that father was arrested in relation to the incident, but was now back in the home. GD stated that she was "afraid to go home, and she fears for baby [MD] when she is at school because she is not there to protect him." GD had only attended 53 of 101 school days and had received three truancy letters.

The petition indicated that there is a long history of domestic violence and alcohol abuse in the home. The petition listed a series of other 911 contacts involving domestic violence, drug use, and alcohol use by mother and father between November 2022 and February 2023. The petition further indicated that mother voluntarily relinquished her rights to two other children in 2015. Mother and father had prior CPS contacts dating as far back as 2011.

The petition further stated that mother and father attended individual team meetings with CPS agents on February 15, 2023, during which they agreed to a safety plan that stipulated that they were not to have contact with each other, and that father was not to have contact with the children. Mother agreed to file for a personal protection order (PPO) against father. On the same day, both parents completed drug screens. Father tested positive for tetrahydrocannabinol (THC), the active ingredient in marijuana. Mother tested positive for hydrocodone, a narcotic. The following day, father was arrested and charged with operating while intoxicated, third offense.

On March 16, 2023, CPS investigator Brown spoke to GD, who reported having seen her father the night before, in violation of the CPS safety plan. Mother confirmed that she saw father while retrieving some things from the family home. The following week, Brown attempted to call mother on the phone repeatedly, and got no answer. At one point, Brown called mother's phone and got a message indicating that the phone number was no longer accepting calls. She went to GD's school and was told that GD had not been in class since March 16, 2023. It ultimately became apparent that mother and father had disappeared with the children. Neighbors indicated that they saw father packing things into a camper, which he then drove to a friend's house. The friend, identified only as "Keith," stated that he believed mother and father left in the camper with the children. Their location was unknown.

The petition indicated that on March 23, 2023, mother called Brown and indicated that she and the children were with their maternal grandfather in Florida. Mother gave Brown a Florida address. Brown called Florida CPS, who performed a welfare check at the address. Neighbors said that an older couple lived in the home, but that no one had seen any children entering or exiting. Brown later spoke to mother's aunt, who reported that the children's grandfather had not seen mother recently. Mother's aunt did not believe the children were in Florida. DHHS requested that the court find that the children were without proper care and custody, exercise jurisdiction over them under MCL 712A.2(b)(1) and (2), and make them temporary court wards.

The petition was filed the following day, and a preliminary hearing was held. Neither parent appeared in court and their whereabouts were unknown. CPS investigator Brown and the children's guardian ad litem (GAL) requested emergency removal and a pickup order for both parents. The referee agreed to issue a pickup order. It elected to adjourn the hearing pending

contact with the parents, but indicated that it would continue the preliminary hearing to a later date, at which point it would authorize the petition. At a hearing held in early April 2023, the referee indicated that a pickup order had been issued, but DHHS had failed to locate the children. The pickup order was continued and the court was adjourned.

The preliminary hearing continued in May 2023. Mother appeared for the hearing, but father did not. Brown testified to the contents of the petition. She indicated that father had been arrested and later released. Brown was unsure of his whereabouts at the time of the hearing. Brown further testified that mother was previously staying with a friend, and did not have housing of her own. When asked whether the housing was appropriate for children, Brown stated that she did not know where mother was staying now, and had not seen her housing. During this exchange, mother repeatedly interrupted and was admonished by the court to remain silent.

Brown further stated that once father was released following his arrest, mother and father fled to Las Vegas, Nevada with the children and had been living in a campground. An altercation between mother and father occurred at the campground and father was again arrested. Following Brown's testimony, the GAL requested that the petition be authorized, but that in-home jurisdiction with mother be granted. The GAL indicated that mother was a victim of domestic violence, but that so long as father remained out of the home, there was no substantial or imminent risk of harm to the children. Mother's counsel agreed, stating that mother had suitable housing and was engaged in services for domestic violence. Counsel for DHHS disagreed and asked that the children be removed from both parents' care, noting that mother fled the state with the children and father, and that it was likely that she would go back to him if he could be found.

Ultimately, the referee authorized the petition and removed the children from father's care, but granted in-home jurisdiction with mother, noting that "[t]here is not a substantial risk of harm when the abuser has left the situation." The referee further indicated that it would enter a no-contact order prohibiting mother and the children from contact with father. The referee found that "[c]onditions of child custody away from father are adequate to safeguard their health and welfare and, frankly, to safeguard mother as well." Before the hearing adjourned, mother indicated that she attempted to file for a PPO, but was unsure whether it had been signed. Brown stated that she had checked several times and found no evidence that a PPO had been granted. Mother agreed to find out why the PPO paperwork had not been filed or to file for a new PPO.

After the preliminary hearing concluded, Brown filed a request for a review of the referee's recommendation to allow mother to retain jurisdiction over the children. At a hearing on the matter, DHHS expressed concern that mother would flee with father and the children again if given the chance, stating that she "continues to put her kids at risk by going back to [father]." The GAL stated that no new developments had occurred and that father had not contacted mother and the children at any point since the petition was authorized. Father's counsel confirmed that he "had no contact whatsoever with [father] on this case." The trial court expressed concern about the fact that mother had fled to another state with the children and lied about her whereabouts. The court opined that it might be better for the children to be placed with a relative[2] with whom they had

_____

[2] The record indicates that the relative is technically "fictive kin," as she was a family friend who had previously taken care of the children.

previously stayed, while mother completed services targeted toward addressing domestic violence and other issues. The court stated:

> I would like to see those services in place for a while and we can come back and look at this . . . . I'm not trying to punish your client.
>
> All I know is because of the fact that they could just leave in the middle of the night, [father] could come back, you know, sweep her off her feet, tell her everything is going to be great again and, boom, here we are. These kids are in the wind again.

The court thus authorized the removal of the children from mother's custody and placed them in the temporary custody of a relative, with supervised parenting time for mother.

At a May 2023 review hearing, foster care worker Aime Delong reported that the children were doing well in their placement. Delong further stated that mother had agreed to submit to drug screens, but had not done so. In more positive news, mother's counsel reported that father remained out of the picture and mother had not had any contact with him. Mother was participating in individual domestic violence therapy as well. The trial court congratulated mother for the positive steps she was taking, but noted that it did not believe mother was ready to have the children returned yet. The court therefore continued its prior orders, but set another hearing for 30 days out instead of the standard 90 days, "to give [mother] the benefit of the doubt[.]"

A pretrial hearing was held in June 2023. At that point, father still had not returned and mother had not had contact with him. Mother was living with a man named Harold Clemons, who had passed a background check. Mother's counsel thus requested that the children be returned to mother's care. Mother's counsel acknowledged that there was an allegation that mother had attended parenting time while under the influence of illicit substances, but stated that mother only acted erratically because the room where parenting time took place was too small, and triggered mother's anxiety and post-traumatic stress disorder. Mother had attempted to get drug screens, but did not have a license and could not pay for screening herself. Mother's counsel pointed out that the adjudication had not yet occurred, and asked whether the court would be willing to order drug screening in the interim.

Foster worker Delong stated that a home study was done on Clemons's home, and it was determined that his home was appropriate for children. Delong stated that she had offered drug screening to mother, but mother had denied it because she believed "the agency would have the ability to alter the results." The last time mother had been drug tested was April 19, 2023, and she had tested positive for hydrocodone and cocaine. Delong stated that DHHS was willing to offer free drug testing. The court observed that expanded parenting time would be appropriate if mother agreed to voluntarily submit to a drug screen and tested negative for all illicit substances. In the meantime, the court offered that parenting time could be supervised, with unsupervised parenting time at DHHS's discretion, pending a clean drug screening.

At a July 2023 pretrial hearing, Delong reported that mother completed a drug screen and had tested positive for "amphetamine, methamphetamine, cocaine, and opiates, along with—hydrocodone[.]" Delong further stated that she spoke to GD, who said that she had spoken to

father multiple times. Delong believed that mother allowed GD to speak to father during the parenting time visits that were supervised only by Clemons. Counsel for DHHS thus requested that parenting time go back to being supervised by DHHS. The trial court granted DHHS's request.

Another pretrial hearing was held in August 2023. Father appeared at the hearing via videoconference, as he was currently incarcerated in the Arenac County Jail. Delong stated that since father had been incarcerated, mother accepted 134 calls from him, in violation of the court's no-contact order. She further stated that Mother was consistent with attending parenting time, but was often distracted or looking at her phone during her visits with the children. As to mother's substance use issues, mother had completed two drug screens since the last hearing. On July 10, 2023, she tested positive for opiates, and on July 12, 2023, she tested positive for hydrocodone and hydromorphone. In all other respects, mother was complying with services, and had completed a psychological evaluation. The trial court continued its prior parenting time order. It advised mother that she should pay more attention during parenting time and stop answering calls from father. The court ordered that the children would be able to speak with father via telephone, but directed him not to speak to the children about the court case.

The adjudication trial was held on August 31, 2023. Brown testified again to the contents of the petition and reviewed the information regarding mother's flight to Nevada, which were discussed in prior hearings. Brown stated that jurisdiction would be appropriate because, although mother was a victim of domestic violence, she "has failed to protect her children on numerous occasions."

Delong testified that the children were doing well in their placement and that GD was doing well in school. Delong agreed that mother had a good bond with both of the children. Delong reiterated her earlier testimony that mother had allowed GD to speak to father on the phone in violation of the no-contact order. When Delong asked mother about this, mother said that GD was "a liar." Delong further stated that mother had accepted 134 calls from father while he was in the Arenac County Jail. The parties stipulated to the entry of a call log, which indicated that some of the calls lasted for as much as "656 seconds" or "696 seconds," which translates to approximately 10 to 11 minutes.

Delong stated that she continued to have concerns about returning the children to mother. She believed mother had not rectified any of the problems that brought the children into DHHS's care, including domestic violence and substance abuse. Delong noted that mother had maintained contact with father in violation of the no-contact order, and continued to test positive for drugs. Mother reported working at T-Mobile, but never provided verification of her employment. Delong believed it was in the children's best interest for them to remain in their foster placement. On cross-appeal, she agreed that it might be appropriate for the children to be returned to mother's care after mother completed some services, including parenting classes and substance abuse treatment.

During cross-examination, Delong stated that mother told her that father had been released from jail. Delong explained that once the case in Arenac County was resolved, father was extradited to Genesee County, where he was released on bond. Father then failed to show up for a court hearing and had not been heard from since. His probation agent was unaware of his location and he still had active warrants out for his arrest.

Mother testified against her attorney's advice. During her testimony, she asserted that the incident leading to the petition, in which father had punched her, was a result of mother putting herself between father and GD while father was yelling at GD. Mother spoke to CPS following the incident, and a CPS worker asked her to get a PPO and to leave father. Mother stated that she tried to get a PPO, but the paperwork never went through.

Regarding mother's flight to Nevada, mother testified that her stepmother and siblings were planning to move to Nevada, and that she told Brown about her plans to potentially move with them. Mother stated that at one point she had a full conversation with Brown, in which she informed Brown that she was moving with the children to Nevada on March 23, 2023. Mother further stated that she spoke with her father—the children's maternal grandfather—who lives in Florida. Mother stated that grandfather told her that he would buy plane tickets to either California or Nevada for her and the children. Mother stated that her aunt lives in California. Mother asserted that she never went to Florida herself, and that her plan was always to go to Nevada. However, when asked directly, she agreed that she told Brown that she was on her way to Florida and gave Brown the address to grandfather's home in Florida.

Mother further agreed that she drove to Nevada with father and the children. She stated that she did not want father to stay in Nevada, but that her sister wanted father to stay "so she could get his money." Mother did not elaborate on what that meant. She then stated that she and father got in a fight while they were in Nevada and that father had been drinking. Father was arrested as a result of that fight. Mother further stated that she did not contact CPS while she was in Nevada because she left her phone in Michigan. Mother stated that she returned to Michigan after father was arrested and had not had contact with him since, outside of the telephone calls from jail.

Regarding the telephone calls, mother stated that she did not answer all 134 calls, and estimated that she only answered 30 or 40 of them total. Of the ones that she answered, mother indicated that she and father discussed the children and father's legal troubles. Father asked if she would get back into a relationship with him, and mother testified that she turned him down. On cross-examination, mother testified that she knew she was violating the no-contact order by speaking to father, and that she told him that there was no-contact order in place.

After father was released from the Arenac County Jail, mother testified that she went up north and stayed there for a little over a week. She indicated that father knew where Harold lived and while she was "[n]ot exactly scared," she "didn't want to put my kids on the line." On cross-examination, mother confirmed that she was not afraid for her children, and went up north to "build a better foundation for me and my children to live in." Mother testified that she had a solid support system to help her stay away from father, and did not need help from the court to keep father away from the children.

Following the close of testimony, the trial court found, by a preponderance of the evidence, that grounds for exercising jurisdiction existed under MCL 712A.2(b)(1) and (2). The court cited the evidence of domestic violence and substance abuse, mother's flight to Nevada while under CPS supervision, GD's persistent truancy from school, and mother's failure to follow the no-contact order, in support of its decision to exercise jurisdiction. An order of adjudication was entered on the same day. This appeal followed.

## II. ANALYSIS

Mother argues that the trial court erred by finding that sufficient evidence was presented to allow it to exercise jurisdiction in this matter. We disagree.[3]

This Court reviews a trial court's decision to exercise jurisdiction over a minor child "for clear error in light of the court's findings of fact[.]" *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004) (citation omitted). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 296-297.

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "The question at adjudication is whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). A court may exercise jurisdiction if the petitioner proves the allegations in the petition at a trial by a preponderance of the evidence. *Id*. at 15. Alternatively, jurisdiction may be exercised if a respondent enters a plea of admission or no contest to the allegations in the petition. *Id*.

MCL 712A.2(b) provides, in relevant part, that Michigan courts have jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide

---

[3] As an initial matter, we note that in her statement of questions presented, mother asks this Court to decide whether the trial court erred by exercising jurisdiction even though mother had placed the children with a relative before the petition was filed, per MCL 712A.13(a)(j). She does not mention this subsection in the body of her brief. It would make little sense for her to do so, given that the record indicates that the children were with mother in Nevada when the petition was filed.

In general, if an issue is not contained in the statement of questions presented, it is waived on appeal. *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019); MCR 7.212(C)(5). Similarly, if an issue is presented in the statement of questions presented, but is not substantively addressed in the body of the brief, it is considered abandoned. See *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008) ("A party abandons a claim when it fails to make a meaningful argument in support of its position."). Nevertheless, mother makes a complete argument regarding jurisdiction and cites supporting authority. DHHS addresses that argument, overlooking the discrepancy between the statement of the issue and the substance of mother's brief. Accordingly, we will address mother's argument as though it was properly presented on appeal. See *Mack v Detroit*, 467 Mich 186, 207; 649 NW2d 47 (2002) ("[A]ddressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle."); *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004) ("[T]his Court possesses the discretion to review a legal issue not raised by the parties.").

proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship . . . .

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. [MCL 712A.2(b)(1) and (2).]

MCL 712A.2 "speaks in the present tense, and, therefore, the trial court must examine the child's situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004).

A review of the record indicates that the trial court's decision to exercise jurisdiction over the children was not clearly erroneous. See *BZ*, 264 Mich App at 295. The trial court observed that when the petition was filed, mother and father had recently gotten into an argument that resulted in a physical fight in which father assaulted mother in front of the children. Before the petition was filed, mother and father filed CPS safety plans, stipulating that mother would keep herself and the children away from father. Mother also agreed to file a PPO, but did not do so. The trial court observed that after the safety plan was filed, mother went to Nevada with father and the children and was living in a campground there. By doing so while under CPS supervision, mother violated her CPS safety plan. The court further observed that mother struggles with substance abuse, and father has issues with alcohol, both of which negatively impact the children. As a result of their parents' interpersonal and substance use issues, the children had been repeatedly exposed to domestic violence. All of these facts indicate that, at the time the petition was filed, the children were subjected to a substantial risk of harm to their mental and physical wellbeing, MCL 712A.2(b)(1), and that as a result of cruelty, drunkenness, and criminality, their home environment was unfit for children, MCL 712A.2(b)(2).

Mother argues that the trial court erroneously considered that she accepted phone calls from father in making its ruling. She argues that "the children were not at risk from the phone calls." We agree that mother's decision to accept a few phone calls from father would perhaps not be enough to justify the exercise of jurisdiction, particularly in a relationship affected by domestic violence. But it was not just a few phone calls—it was 134 phone calls, spanning approximately 1466 minutes, which is the equivalent to approximately 24 *hours*. Further, the court correctly observed that even if it were to find mother's testimony that she only answered "30 or 40" of those calls, she still violated the court's no-contact order "30 or 40" times.

Although the trial court should largely look to the contents of the petition when making its jurisdictional ruling, see *MU*, 264 Mich App 279, it need not exclude evidence of events that occur after the petition is filed, so long as the evidence is relevant to the allegations in the petition. *In re Dearmon*, 303 Mich App 684, 696-697; 847 NW2d 514 (2014). At most, the only evidence that needs to be excluded in such circumstances is evidence of abuse or neglect that occurs outside the allegations in the petition. *Id*. at 698. By stating that the phone calls were not a sufficient basis

for exercising jurisdiction, mother expects us to look at the phone calls in a vacuum. But she ignores that when the petition was filed, CPS did not know where she or the children were, even though mother had been in contact with CPS and had signed a safety plan at that point. Mother misled CPS investigator Brown by telling Brown that she was taking the children to Florida. It was later determined that mother and father drove the children to Nevada and were living in a campground after yet another domestic violence incident led to father's arrest. Mother has repeatedly demonstrated that she cannot avoid contact with father, despite the court's insistence on a no-contact order, and despite the fact that remaining near father meant that the children were repeatedly exposed to domestic violence and abuse.

As with her testimony at the adjudication trial below, mother explains her actions in this matter differently, arguing that she went to Nevada to start a new life for her children and did not intend to continue a relationship with father. She argues that everything she has done has been in pursuit of that goal. However, the trial court did not find mother's testimony credible, instead stating that it found Brown's and Delong's testimony credible, and that both were "reliable, truthful witnesses[.]" As the finder of fact, the trial court was in the best position to assess witness credibility. *Berger*, 277 Mich App at 705. It is not this Court's place to interfere with credibility determinations on appeal. *Id*. It is clear that mother is in a difficult position as a survivor of domestic violence. We are sympathetic to that fact. In the context of a termination of parental rights, this Court has stated that "it would be impermissible for a parent's parental rights to be terminated solely because he or she was a victim of domestic violence." *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). However, the Court found that termination was proper where the "respondent's own behaviors were directly harming the children or exposing them to harm." *Id*. The same general principle applies here as well. Although the court may not exercise jurisdiction solely because mother is a domestic violence survivor, her own behaviors directly exposed the children to harm as contemplated in MCL 712A.2(b)(1) and (2). Indeed, GD offered insight into the direct harm caused by her parents' toxic relationship. It was GD who contacted 911 when father assaulted mother on February 6, 2023. GD later told CPS investigator Brown that she feared baby MD could come to physical harm just by being present while father was assaulting mother. For that reason, GD put aside the fear for her own safety in order to protect her brother. GD was likewise often truant from school, attending only 53 out of the 101 days that school was in session. On this record, the trial court did not err by exercising jurisdiction.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

-9-